

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00307-CV

IN THE INTEREST OF A.A.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-103402-16

----------

## MEMORANDUM OPINION[1]

----------

Appellant D.V. (Father) and I.A. (Mother) took A.A. to Cook Children's Hospital when she was about four months old. Doctors discovered that A.A. had bleeding on her brain, healing fractures of both upper and lower legs, and five broken ribs. Child Protective Services (CPS) removed A.A. from her parents,

---

[1]*See* Tex. R. App. P. 47.4.

and the Texas Department of Family and Protective Services (TDFPS) filed a petition for termination of the parents' rights to A.A. After a bench trial, the trial court found by clear and convincing evidence that:

- Father "failed to comply with the provisions of a court order that specifically established the actions necessary . . . [for] the return of [A.A.] who ha[d] been in the . . . temporary managing conservatorship of [TDFPS] for not less than nine months as a result of [her] removal from the parent . . . for . . . abuse or neglect"; and

- termination of the parent-child relationship between Father and A.A. is in her best interest.

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (2) (West Supp. 2017). The trial court therefore terminated Father's parent-child relationship with his daughter A.A. In two issues, Father challenges the legal sufficiency of the evidence supporting the best-interest finding and the factual sufficiency of the evidence supporting both findings. We affirm.

## I. BACKGROUND FACTS

### A. A.A. Was Admitted to Cook Children's Hospital with Serious Injuries.

Father and Mother took A.A. and her twenty-two-month-old half-sister E.A. to Cook Children's Hospital on Monday, June 20, 2016. Testimony conflicted about whether the parents sought treatment only of E.A., who was sick and vomiting, or also of A.A., whose swollen head Father had noticed the previous evening. Regardless, after nurses noticed A.A.'s enlarged head, the hospital admitted A.A., and Dr. Sophia Grant, one of about 350 board-certified child abuse pediatricians in the United States, evaluated her the next morning. Dr.

Grant testified that A.A.:

- "appeared to be in pain or uncomfortable";

- had the body and weight of a two-week-old but her head was "markedly bigger than the rest of her body";

- "would have looked like a very tiny baby with a very large head";

- had brain issues and injuries including:

  (1) intracranial pressure, as indicated by an "open and full" fontanelle;

  (2) chronic, large, subdural hematomas;

  (3) "a small amount of subarachnoid hemorrhage with a thrombosed [clotted] and torn bridging vein[]"; and

  (4) some brain atrophy;

- had five healing rib fractures with calluses on the right side of her body;

- had healing fractures of her left and right femurs; and

- had left and right tibia fractures.

Dr. Grant also testified:

- "[I]t would have been very obvious" to an ordinary person that something was wrong with the size of A.A.'s head;

- A.A.'s "large head . . . was a result of her bleeding on her brain which caused the bones to separate";

- The word "chronic" "means an ongoing process; something that didn't happen the day before or two days before";

- A.A.'s femur fractures and right tibia fracture were consistent with classical metaphyseal fractures or lesions, which result "from a sudden jerking or pulling"; "a shearing force on the edge of the bone . . . causes . . . tearing off of the top of the bone";

- The force that could cause the fractures:

3

would be a force that any reasonable person would recognize was inappropriate. When it occurred, the baby would scream out in pain. These injuries can also occur with acceleration, deceleration. If the limbs are flailing like a rag doll, that can cause enough force to cause the metaphyseal lesions to occur[;]

- By acceleration and deceleration, Dr. Grant meant:

  the rapid movement forward, rapid movement back, rapid movement forward, rapid movement back, repeated.

  And a child of this age cannot keep her head still, so if she were to experience those forces, her head would be going back and forth, but also side to side, because she doesn't have the neck musculature or the awareness to try and keep her head straight. So . . . those kids suffer the most damage just because of poor neck control and also because the head is much bigger than the rest of the body relatively speaking;

- A callus can form in "maybe five days, but . . . they are very prominent at 10 days." However, Dr. Grant also testified that it takes at least two weeks "to see callus formation"; and

- A.A.'s rib fractures could only have occurred from someone holding her and putting too much pressure on her ribs.

Dr. Grant denied that

- There was evidence of a birth defect in A.A.'s brain;

- Brittle bone disease, which is a genetic disease, could have caused A.A.'s fractures; and

- The fractures could have resulted from a fall.

Dr. Grant believed that A.A.'s multiple healing fractures and hematomas showed that A.A. "was [a] victim of nonaccidental trauma" and had been "victimized at various points on more than one occasion." Dr. Grant explained

4

that child abuse pediatricians use terms like "abusive head trauma" and "nonaccidental head injury" for "shaken baby syndrome."

CPS investigator Haley Koren testified that doctors performed surgery, drilling burr holes into A.A.'s head to alleviate the cranial pressure. A.A. was hospitalized for at least a week.

## B. Neither Mother nor Father, A.A.'s Only Caretakers, Claimed Responsibility for Her Injuries.

It was undisputed that Mother was A.A.'s primary caretaker and that Father was A.A.'s only other caretaker. On June 21, 2016, CPS investigator Koren and a police detective interviewed the parents separately. Koren testified that Mother told her:

- Mother noticed A.A.'s head was getting larger the Wednesday before the removal and told Father;

- Mother's four-year-old son A.E. caused the injuries by picking A.A. up out of her crib; and

- Mother had seen A.E. "trying to get off the bed with A.A. at one point."

CPS investigator Koren testified that Father told her:

- He had been alone with A.A. when Mother showered and on similar brief occasions;

- He did not know how A.A. was injured;

- He did not know if Mother could have caused the injuries but "had doubts as to whether or not she actually caused [them]";

- Mother told him that A.E. had done it, and he believed her;

- He did not notice A.A.'s swollen head until the weekend;

5

- He called JPS, where A.A. was born, to find out if the swelling was normal and was told that it was normal; and

- He called Cook Children's to schedule an appointment for A.A. but could not get an appointment until August.

CPS investigator Koren also testified:

- She noticed A.A.'s enlarged head immediately upon first seeing her;

- She did not believe that the parents had failed to notice A.A.'s head getting bigger and bigger;

- A previous investigation for physical abuse of E.A., who suffered a broken humerus, had been closed with the explanation that A.E. "had been jumping and fell on top of her";[2]

- The parents told Koren that they did not get frustrated with A.A. and would rock her;

- Before the removal, A.A. had not been seen by a doctor since her release from the NICU after her premature birth;

- According to the parents, the CPS referral, and Koren's discussions with medical staff, the parents went to the hospital on June 20, 2016 because E.A. was sick, not because of A.A.'s head;

- The "nurses noticed A.A.'s head and said that they needed to take a look at her";

- Mother "always seemed to have a flat affect" on each of the two or three occasions Koren interviewed her:

> She really didn't have much emotion with regards to the situation, in regards to . . . [A.A.] being in the hospital and in regards to her being severely injured. . . . [N]ot once did she ask how the[ children] were doing while they were in foster care. Not once did she ask how [A.A.] was doing. The only person that seemed to want to know was [Father]; and

---

[2]That injury appears to have occurred in June 2015 when E.A. was ten months old and her brother A.E. was three years old.

6

- Father "seemed concerned . . . about what happened" and showed emotion.

Father testified that he had noticed the swelling in A.A.'s head the day before he and Mother took her to the hospital but that Mother had noticed it first. Father also testified:

- He did not know what had caused A.A.'s injuries;

- Mother told him that she did not harm A.A.;

- He had been with Mother for two years before "this happened, and . . . while she's been taking care of her children and nothing like this has ever happened";

- Mother told him that on one occasion, A.E. took A.A. out of her crib and that A.A. was crying while he carried her;

- A.E. had hurt E.A.'s arm before, CPS investigated, and the case was resolved; and

- A.A. was at risk for intraventricular hemorrhage before she left the NICU after her premature birth.

## C. TDFPS Removed A.A., and the Trial Court Terminated Mother's and Father's Parent-Child Relationships with A.A.

A.E. was with his father in East Texas when the removal occurred and remained in his father's custody. TDFPS removed A.A. and E.A. from their parents and found reason to believe that Mother had caused A.A.'s injuries. The trial court ultimately terminated Mother's parental rights to her two daughters, E.A.'s father's parental rights, and Father's parental rights to A.A. Only Father has appealed.

7

## II. SUFFICIENCY OF THE EVIDENCE

### A. Burden of Proof

For a trial court to terminate a parent-child relationship, TDFPS must prove two elements by clear and convincing evidence:

1. that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and

2. that termination is in the child's best interest.

Tex. Fam. Code Ann. § 161.001(b) (West Supp. 2017); *In re E.N.C.*, 384 S.W.3d 796, 802–03 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

### B. Standards of Review

#### 1. Legal Sufficiency

To determine whether the evidence is legally sufficient to support the trial court's best-interest finding, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that termination of Father's parental rights is in A.A.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We presume that the trial court settled any conflicts in the evidence in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved,

8

and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

The trial court is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

### 2. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination findings. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the trial court's findings and will not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that Father violated subsection (O) and that termination of the parent-child relationship between Father and A.A. would be in her best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### C. The Evidence is Legally and Factually Sufficient to Support the Trial Court's Best-Interest Finding.

In his second issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding.

### 1.    Substantive Law on a Child's Best Interest

In reviewing the factfinder's determination of a child's best interest, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b). We consider the evidence in light of nonexclusive factors that a trier of fact may apply in determining a child's best interest:

(A)    the [child's] desires . . . ;

(B)    the [child's] emotional and physical needs . . . now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the [parent's] acts or omissions . . . indicat[ing] that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

      2.     **Evidence Pertaining to A.A.'s Best Interest**

      a.     **A.A.'s Present and Future Medical Needs**

Dr. Sophie Grant, the child abuse pediatrician who evaluated A.A., testified that she did not believe that A.A. would "ever be normal as a result of [her] head injuries." CPS caseworker Katherine Manigrasso testified:

- A.A.'s "health is a huge concern";

- "[S]he really needs close monitoring";

- A.A. "is always going to have to be careful because of the subdural hematomas and the doctors have stated that if she were to reinjure her head that they could begin to bleed again";

- A.A. will require stable, follow-up medical care;

- A.A.'s specialists include a neurosurgeon, a neurologist, an ophthalmologist, and a gastroenterologist;

- A.A. receives physical therapy and speech therapy;

- A.A. was eighteen months old at trial and had only just begun walking;

- A.A.'s speech is delayed;

- A.A.'s long-term prognosis and the extent of her brain damage are unknown.

11

## b. Evidence on Cause of A.A.'s Injuries

When asked at trial how A.A. sustained her injuries necessitating removal, Mother invoked her Fifth Amendment right not to testify.

Father testified that he did not think that Mother could have caused A.A.'s injuries because "[s]he's not a violent mother. She's not violent. She loves her children very much. She had two children before this problem, and [Father] saw how she was with her children[—]taking care of them and affectionate." He also testified that if there was proof that Mother had injured A.A., he would try to help Mother.

Katherine Manigrasso, the CPS caseworker, testified that she did not believe that Father honestly did not know how A.A. was injured. Similarly, CPS investigator Haley Koren stated that she did not believe that Father had failed to notice A.A.'s head getting bigger and bigger over time. Caseworker Manigrasso believed Father "was trying to justify to himself another explanation [for A.A.'s injuries besides Mother] because it was too painful to have to deal [with] choosing between his partner and his child."

Mother (during the investigation) and Father (during the investigation and at trial) both expressed the belief that Mother's four-year-old son A.E. had caused all A.A.'s injuries, but Dr. Grant testified that a four-year-old could not inflict the injuries A.A. suffered. Father also suggested that A.A.'s injuries had been related to her premature birth, but Dr. Grant likewise dispelled that notion, denying that the fractures and head trauma were related to A.A.'s prematurity

and denying that A.A.'s injuries predated her release from the NICU to her parents. Dr. Grant opined that A.A. had been abused on multiple occasions.

### c. Danger to A.A.

Dr. Grant believed that A.A. was "in grave danger" before her removal from Father and Mother and that A.A. "would most likely be the victim of an escalating level of violence and possibly even die" if she "were . . . returned to the previous environment." Similarly, CPS caseworker Manigrasso did not believe Father "would be protective" of A.A. and stated that he "ha[d] not demonstrated protective capacity by continuing to say that he d[id] not know what happened to [A.A.] when it [was] abundantly evident that this was a nonaccidental injury that happened to her." Manigrasso testified that returning A.A. to Father would be like returning her to Mother, and that would be placing her in a "[v]ery dangerous" environment.

Father testified:

- He did not see any reason why Mother could not be around A.A.; and

- Whether he allowed Mother to see the children if her rights were terminated and his were not would depend on the trial court's orders.

### d. Evidence of Father's Stability

Father testified that while the case was pending, he worked in Texas, then two and a half months in Michigan, then a month and a half in Virginia, and then the three weeks before trial in Kaufman, Texas. Father testified that during that three-week period, he and Mother had been living in a duplex behind her uncle's

13

house in Tyler, Texas.  CPS caseworker Manigrasso testified:

- The parents did not tell her they had been living in Tyler for the past three weeks until the day before trial;

- The parents did not provide her with an address, photos of the home, or any details of the home; and

- Manigrasso had no way of knowing whether the home would be appropriate for young children.

Father admitted that he had gaps of unemployment between the different jobs. However, he stated that if A.A. were returned to him, he would not keep taking jobs all over the country and "would settle down here again in Texas."

### e.    Plans for A.A.

Father wanted A.A. returned to Mother and him.  He testified that his plan was for Mother to stay home with A.A. while he would continue to work his same ten-hour days.  He testified that Mother's uncle and aunt in Tyler would help take care of the children but admitted that the uncle works full-time and the aunt works part-time.  Father did not know whether the uncle and aunt could pass criminal or CPS background checks.  He stated that if it was necessary, he would hire someone to help Mother take care of A.A. or he would take her to daycare.

Meanwhile, TDFPS had placed A.A. with her sister in an adoption-motivated foster home, and TDFPS planned for the foster parents to adopt the sisters if the trial court terminated the parents' rights.  CPS caseworker Manigrasso testified that the foster parents get A.A. to all her appointments and meet her medical needs.  She believed that it would be in A.A.'s best interest for

the parental rights to be terminated.

### 3.    Resolution

Looking at all the evidence, whether in the light most favorable to the judgment or showing due deference to the factfinder, we conclude that the trial court could have found that Mother caused A.A.'s injuries.  Mother's refusal to testify about the cause of A.A.'s injuries also supports such a finding.  *See* Tex. R. Evid. 513(c); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976) (holding Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them); *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995); *In re C.W.*, No. 02–17–00025–CV, 2017 WL 2289115, at *3 (Tex. App.—Fort Worth May 25, 2017, no pet.) (mem. op.).  This finding drives the best-interest analysis.  While Father's testimony indicated that he wanted to raise and support A.A. and was willing to have a stable lifestyle upon her return to him, it also showed that he did not believe that Mother injured A.A. and, regardless, that he was unwilling to leave Mother.  Further, even though Father said that he was willing to place A.A. in daycare if necessary to obtain her return, Father's desired plan was for Mother to continue to care for A.A., whether as a primary caregiver or with part-time supervision.  However, Mother represented an ongoing and future danger for A.A., and Father's unwillingness to part from

Mother could have convinced the trial court that Father would be unable to protect A.A. from further danger.

TDFPS's plan was for A.A. and her half-sister to be adopted by their foster parents, who could continue to satisfy A.A.'s extensive medical needs.

Based on all the evidence and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Father and A.A. was in her best interest. We overrule Father's second issue.

**D.    The Evidence is Factually Sufficient to Support the Trial Court's Finding that Father Failed to Comply with the Court-Ordered Service Plan.**

In his first issue, Father contends that the evidence is factually insufficient to support the trial court's finding that he violated family code section 161.001(b)(1)(O) by

> fail[ing] to comply with the provisions of a court order that specifically established the actions necessary for the . . . return of [A.A.] who ha[d] been in the . . . temporary managing conservatorship of [TDFPS] for not less than nine months as a result of [her] removal from the parent . . . for . . . abuse or neglect.

Tex. Fam. Code Ann. § 161.001(b)(O).

Father concedes that he was ordered to "comply with each requirement set out in [TDFPS's] original, or any amended, service plan during the pendency of this suit." He also admits that his service plan required him to:

1.    Actively participate in and successfully complete INDIVIDUAL COUNSELING.

16

2. Show the ability to maintain STABLE HOUSING.

3. Maintain and demonstrate proof of legal INCOME.

4. Attend all scheduled VISITATIONS.

5. Comply with all requests for RANDOM DRUG TESTING as requested by CPS.

6. REFRAIN FROM CRIMINAL ACTIVITIES and illegal acts.

7. Actively engage in and complete a PARENTING CLASS/SEMINAR.

8. Should engage and complete COUPLES COUNSELING once completed with the individual counseling and recommended by his therapist.

9. Will actively engage in an educational sessions [sic] with The Shaken Baby Alliance[.]

As TDFPS points out, that list was taken from the status report, not any of the service plans on file. The most recent service plan for Father in the clerk's record was filed with the trial court on July 11, 2017, and referenced in Petitioner's Exhibit 11, the August 3, 2017 Permanency Hearing Order, admitted into evidence without objection. In addition to detailing the tasks listed above, the service plan required Father to:

- Provide an accurate explanation for A.A.'s injuries;

- Submit to a psychological evaluation;

- Locate and obtain community resources; and

- Cooperate with CPS and participate in his case by remaining in contact with his caseworker and submitting all requested documentation.

Katherine Manigrasso, the CPS caseworker, testified that:

- Father "maybe completed half" of his services;

17

- Father was "successfully discharged" from individual counseling "because he obtained employment out of state, and he could no longer attend therapy sessions";

- Father and Mother had only one session of couple's counseling because they moved for Father's work;

- Manigrasso believed that couple's counseling was important because "there is obviously some type of disconnect between the two parents where both parents admit that they are the only caregivers for a child with very serious injuries, yet neither parent is willing to come forward and provide a truthful explanation for what has happened";

- Father and Mother "continue[d] to visit the children on a looser schedule . . . , every three weeks instead of every two weeks";

- When the parents moved to Michigan for Father's work in March 2017, they did not seek services anywhere else; and

- Manigrasso was concerned with the number of places the parents lived during the case:

> It's a lack of stability for a child. They have moved quite a bit. Even before the move in March [2017] they were working out of state at the time that [she] gave them their service plan. So apparently with [Father]'s line of work, there are opportunities that come up quite a bit out of state, and it's financially advantageous from his description but not a good environment for a child going from hotel to hotel.

The evidence showed, among other deficiencies, that Father did not complete couple's counseling. Father raises no argument—and we do not conclude—that he proved by a preponderance of the evidence that he (1) was unable to comply with specific provisions of the court order, (2) made a good faith effort to comply with the order, and (3) was not at fault for failing to comply. *See* Tex. Fam. Code Ann. § 161.001(d) (West Supp. 2017); *In re T.B., Jr.*, No. 09-17-

18

00230-CV, 2017 WL 5180067, at *3 & n.3 (Tex. App.—Beaumont Nov. 9, 2017, no pet.) (mem. op.); *In re C.A.W.*, No. 01-16-00719-CV, 2017 WL 3081792, at *5 & n.12 (Tex. App.—Houston [1st Dist.] July 20, 2017, pet. denied) (mem. op. on reh'g).  Accordingly, applying the appropriate standard of review, we hold that the evidence is factually sufficient to support the trial court's finding that Father failed to comply with a court order that specifically established the actions he needed to take for A.A. to be returned to him.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).  We overrule his first issue.

## III.  CONCLUSION

Having overruled Father's two issues, we affirm the trial court's judgment.


/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL:  MEIER, GABRIEL, and PITTMAN, JJ.

DELIVERED:  February 8, 2018